ALO PEPE STEFFANY of Fagasa, widow,
WILLIAM STEFFANY of Pago Pago, Master Mariner, and
JOSEPH STEFFANY of Lotopa in Western Samoa, Retired Master Mariner, Plaintiffs

v.

HERBERT J. SCANLAN and JOSEPH V. LANGKILDE, both of Fagatogo, Merchants, Defendants
BERNARD K. TRASK, Intervener, as a Party Defendant

No. 25-1961

High Court of American Samoa

Civil Jurisdiction, Trial Division

May 2, 1961

Heard before MORROW, *Chief Judge*, and TAUALA and LETULIGASENOA, *Associate Judges*, at Fagatogo on April 18, 19, and 20, 1961.

Rolland Metcalfe, Counsel for the Plaintiffs.

Bernard K. Trask, Counsel *pro se* and the other defendants.

OPINION OF THE COURT

MORROW, *Chief Judge*.

On January 31, 1961 the plaintiffs filed their petition seeking recovery of $11,000 from the defendants for rental of the M. V. SAMOA, or, alternatively, $11,000 for the use and occupation of the same ship. Bernard K. Trask asked leave to intervene as a party defendant upon the ground, among others, that "The judgment of the Court may bind petitioner as a contributor." It appearing to the

Court that Mr. Trask was a partner together with the named defendants in the transactions giving rise to the claim alleged by the plaintiffs, the Court granted him leave to intervene as a party defendant.

Plaintiffs are the owners of the M. V. SAMOA. Their claim is based upon a lease of the ship to the defendants entered into in September 1959 by the terms of which the lessees upon the "signing of this agreement by the lessors Joseph and William Steffany" were to take immediate possession of the M. V. SAMOA and commence refitting it for fishing purposes. The lessees were to pay as rent for the vessel $1,000 a month "for a period of 12 months commencing the first day upon which the M. V. SAMOA shall be put in actual service as a fishing vessel."

Pursuant to the terms of the lease, the plaintiffs delivered the ship to the defendants following its signing. The defendants proceeded to refit it for fishing. It was stipulated during the hearing that the ship was put into actual service as a fishing vessel on March 13, 1961. At the end of the 12-month period the defendants returned the ship to the plaintiffs. No rent has been paid.

The vessel was rented in the name of Herbert J. Scanlan, one of the partners, the lease being signed by him for the partners who were doing business under the name of the "Samoan Fisheries." The lease was also signed by William Steffany and Joseph Steffany. It was not signed by Alo Pepe Steffany. Alo Pepe Steffany is an elderly Samoan woman and the mother of William and Joseph. She is a co-owner of the ship with William and Joseph.

The defendants resist payment of the rent on a number of grounds. It is claimed by Counsel Trask (also a partner and the intervener-defendant) for the defendants that the lease of the ship was void under the statute of frauds, not being signed by Alo Pepe Steffany, who was one of the co-owners. This contention overlooks the fact

459

that there is no statute of frauds in the American Samoan Code. "The English Statute of Frauds, 29 Car. II, is usually not considered as extending to this country, and is of force here only by virtue of its adoption by the legislatures of the several states, directly or indirectly." 49 Am.Jur. 364. As in the states, the English statute of frauds was, not brought to American Samoa as a part of the common law. It would follow, therefore, that the lease could have been oral and signed by no one. "The fact that one of the parties has signed the contract does not necessarily require that the other party should do likewise. A written contract, not required to be in writing, is valid if one of the parties signs it and the other acquiesces therein. Acceptance of a contract by assenting to its terms, holding it, and acting upon it may be the equivalent to a formal execution by one who did not sign it." 12 Am.Jur. 552. There was acquiescence here without Alo Pepe's signature when the plaintiffs delivered the ship to the defendants and the defendants began to refit it. Herbert J. Scanlan signed for the defendants.

Defendants Herbert J. Scanlan, Langkilde and Trask met with Joseph Steffany at the home of Herbert J. Scanlan one evening in September 1959 for the purpose of signing the lease. Trask had carried on the negotiations with the Steffanys for the making of the lease and he had prepared it for signature. William and Joseph had always handled all matters in connection with the M. V. SAMOA, their elderly mother having left everything in connection with the ship to them. The lessees knew this, having been so informed by William.

At the meeting at Scanlan's home to execute the lease Mr. Trask, who was acting as counsel for himself and his partners in the leasing of the vessel, told the assembled group that it was not necessary for Alo Pepe to sign; that William and Joseph's signatures were enough. The 11th

paragraph in the lease provided "That upon the signing of this agreement by the Lessors Joseph and William Steffany, the Lessee shall take immediate possession of the M. V. SAMOA and shall commence refitting of said vessel for fishing purposes." The reason that the 11th paragraph in the lease was drawn by Mr. Trask so as not to require the signature of Alo Pepe before the partners should take possession of the ship and begin refitting it was because, according to the evidence, Mr. Trask told the parties that her signature was unnecessary in view of the fact that she had always left everything in connection with the handling of the ship to her mariner sons, Joseph and William, who were to sign. It was intended by the parties that she should not sign. Since the lease itself provided that upon the signing by Joseph and William only, the lessees were to take immediate possession of the ship and begin refitting it, it is obvious that it was not intended by the parties that Alo Pepe's signature was to be a condition precedent to the existence of a valid lease.

Mr. Trask had four or five copies of the lease on hand at Scanlan's home to be signed. Partner Herbert J. Scanlan testified that he signed for the defendants. Joseph Steffany signed. It was then nearly 10:00 o'clock in the evening. Mr. Trask took the copies already signed by Herbert and Joseph to William to get William's signature. William was on the ISABEL ROSE about ready to sail for Apia. At first he refused to sign, partly because he was "kind of afraid" to sign, as he testified, and partly because he had not read the document. He couldn't read it without glasses, which he did not have. According to his testimony Mr. Trask told him to sign, which he did after being informed that Joseph had signed. The lease was not read to William before he signed. William testified that he did not trust Mr. Trask. After he signed he told Mr. Trask in substance that the lease was "no good" without Alo Pepe's and Herbert

461

Scanlan's signatures. We believe that William was in error in implying that Herbert had not signed because Herbert himself testified that he signed at his home with Mr. Trask and Joseph present. William signed four or five copies on the ISABEL ROSE. According to his testimony, Mr. Trask tried to get all of them away from him so that he would not have a copy. But William did get one copy back from Trask which he gave to his son to give to his wife who, at William's direction, was to take it to Wayne Storer, the Manager of the Bank of American Samoa, or to the Attorney General. It was taken to Mr. Storer the next morning. He sent it to the Attorney General. It was either lost or misplaced for William never saw it again.

 It is claimed by counsel for the defendants since William said when signing that the lease was "no good" without Alo Pepe's and Herbert's signatures that the lease was void and did not create an obligation to pay any rent. We think that William was merely expressing a sailor's legal opinion when he said the lease was "no good" and that he changed his mind about its legality by the time the lessors delivered possession of the ship to the lessees the next day. The lessors recognized the lease as valid by delivering the ship to the lessee pursuant to Paragraph 11 of the lease which, as we have already indicated, reads: "That upon the signing of this agreement by the lessors Joseph and William Steffany, the lessee shall take immediate possession of the M. V. SAMOA and shall commence refitting of said vessel for fishing purposes." In other words, the lessors recognized the lease as valid by delivering the vessel pursuant to Paragraph 11, and the defendants recognized it as valid by accepting possession of the vessel and commencing to refit it for fishing purposes. If William did intend that Alo Pepe's and Herbert's signatures should be a condition precedent to the existence of a valid lease, he

waived that condition when the ship was delivered to the lessees.

■ The editors of Corpus Juris Secundum have this to say about the practical construction of a contract by the parties:

"Where the parties to a contract have given it a practical construction by their conduct, as by acts in partial performance, such construction may be considered by the court in construing the contract, determining its meaning, and ascertaining the mutual intention of the parties at the time of contracting; it is entitled to great, if not controlling, weight in determining the proper interpretation of the contract; and it will generally be adopted by the court." 17 C.J.S. 755.

William and Joseph recognized and construed the lease as a valid and existing agreement by delivering the vessel the next day and the defendants did likewise by accepting delivery and commencing to refit it for fishing. The conduct of both the plaintiffs and the defendants is explainable only upon the basis that the document previously signed was a valid and subsisting lease.

■ We now repeat a part of our prior quotation from American Jurisprudence:

"A written contract, not required to be in writing, is valid if one of the parties signs it and the other party acquiesces therein." 12 Am.Jur. 552.

Herbert J. Scanlan signed the lease for the defendants and the plaintiffs acquiesced in it without Alo Pepe's signature by delivering the ship to them. The delivery and acceptance of the ship was clearly pursuant to Clause 11 in the lease. Since there is no statute of frauds in American Samoa, no writing was necessary in the first place.

■ Furthermore, while it may not be necessary to a decision, we remark that since Attorney Trask, while acting as counsel for and agent of the defendants, stated to

463

the parties before anyone signed that Alo Pepe's signature was not necessary and since the lessors delivered the ship to the lessees without her signature, it follows that the defendants may well be estopped from denying the validity of the lease because of the lack of Alo Pepe's signature. Upon the evidence, there was certainly an estoppel at least in favor of lessor Joseph Steffany. See 19 Am.Jur., Tit. Estoppel, Sec. 34, P. 634.

█ Counsel for the defendants claims that William's remark to him when signing that the lease was "no good" without Alo Pepe's and Herbert's signatures shows that he intended their signatures to be a condition precedent to the existence of a lease, as far as he was concerned. However, as we have already said and basing our conclusion upon Herbert's testimony, we believe that Herbert's signature was on the lease before William signed. After a consideration of the evidence, we do not believe that it was his intention to make Alo Pepe's and Herbert's signing such a condition but that he was, as we have said, merely expressing a sailor's legal opinion. But conceding that he did at that time intend their signatures to be a condition precedent to his liability on the lease, the fact is that he and Joseph delivered the ship to the defendants pursuant to Clause 11 in the lease, and the delivery was accepted. If there was a defect in the lease because of the lack of Alo Pepe's signature, the defect was cured by the delivery of the ship, such delivery constituting a ratification of the lease by the lessors. In connection with ratification of a defective or void contract, the editors of Corpus Juris Secundum have this to say:

"A defect in the method of executing a written instrument evidencing a contract, or even want of execution, may, in general, be cured by ratification which may be express or implied. A party who accepts benefits accruing under a contract may be bound, notwithstanding defects in, or want of, execution." 17 C.J.S. 419.

It is our conclusion that the defendants became bound by the lease without Alo Pepe's signature certainly no later than the time they accepted the benefits under it by taking possession of the M. V. SAMOA from the lessors. Even a forged instrument may be ratified. *Di Lorenzo v. Atlantic National Bank of Boston*, 278 Mass. 321, 180 N.E. 148. It has been held by a number of courts that entry and occupation under a defective or invalid lease may create the relationship of landlord and tenant.

"A void lease under which occupation has been entered into may, according to the weight of authority, be admissible for the purpose of showing the character and terms of the defendant's occupation." 35 Corpus Juris 960, citing *Crawford v. Jones*, 54 Ala. 459; *Nash v. Berkmeir*, 83 Ind. 536; *Goshorn v. Steward*, 15 W.Va. 657, as well as cases from other states and England and Canada.

We think that under the circumstances of this case Attorney Trask, acting for himself and the other defendants, was entirely correct when he advised the parties about to execute the lease that Alo Pepe's signature was not needed on it.

There are two notations on the first page of the lease initialed by Herbert J. Scanlan, who signed it for the defendants. Both notations were obviously made to correct mere clerical errors in typing the lease. The evidence was that Attorney Trask, who drew the lease, made the notations. The notations, as shown by the evidence, made the lease read in accordance with the intention of the parties. As stated by the editors of Corpus Juris Secundum:

"The contract must be read according to the intent of the parties in spite of clerical errors and omissions which if followed would change that intention." 17 C.J.S. 734 .

As originally typed the lease read "That for and in consideration of the sum of One Thousand Dollars ($1,000.00) payable on the 30th day following the date on which the motor vessel, the M. V. SAMOA, shall be used by

the Lessee as a fishing vessel, and on every subsequent 30th day thereafter, the Lessors, by these presents and upon the conditions hereinafter enumerated, lease the motor vessel called the M. V. SAMOA . . . to the lessee . . . for a period of 12 months commencing the first day upon which the M. V. SAMOA shall be put into actual service as a fishing vessel."

The first notation consisted of inserting the words "a like sum" in pencil so that the first part of the quoted clause then read "That for and in consideration of the sum of One Thousand Dollars ($1,000.00) payable on the 30th day following the date on which the motor vessel, the M. V. SAMOA, shall be used by the Lessee as a fishing vessel, and *a like sum* (emphasis added) on every subsequent 30th day thereafter . . ." etc. The second notation, also initialed by Herbert J. Scanlan, merely makes a subsequent clause on Page 1 accord with the first notation.

These notations did not constitute modifications in the lease. They merely made it read as the parties had actually intended that it should read in the first place. The evidence showed that clearly. We think that Mr. Trask was perfectly honest in his drafting of the lease and that the omission of the words "a like sum" was a mere clerical error which could have happened in the case of any lawyer, and the fact that he later, according to the evidence, corrected the error absolves him of any dishonesty in the drafting of the document, despite his distrust by William.

The 9th clause in the lease, as it was when originally executed, provided that "The lessee shall, *if possible in American Samoa* (emphasis added), insure said vessel for a reasonable amount made payable to the lessors." It developed that it was not possible to secure insurance on the M. V. SAMOA in American Samoa.

After the refitting of the ship had proceeded for some months and no insurance had been procured, William be-

gan to fear that the ship, after being refitted, might be taken out to sea by the defendants and lost and that the Steffanys would not be compensated for the loss. And this could well have happened if the ship had been lost or damaged by an Act of God since Clause 8 in the lease provided that "in no case shall the Lessee be answerable to the Lessors for damages sustained by an Act of God, or capture by pirates or enemy aliens in time of hostilities." Because of these fears, William complained to the Attorney General and others about there being no insurance. Finally the defendants agreed to a change on the third page of the lease so that it would read that "The Lessee shall insure said vessel for a reasonable amount made payable to the Lessors."

This change enlarged the obligation of the defendants with respect to insurance. It cast upon them a duty to procure insurance in any event whereas the lease as originally drawn required them to procure insurance only "if possible in American Samoa," which it was not. The change, therefore, was a modification of the lease and not a mere correction of a clerical error to make the lease read as it was originally intended by all parties to read, as was the case with the two notations initialed by Herbert J. Scanlan on Page 1 of the lease. This modification made on the third page was initialed by William and by Mr. Trask for the defendants. It was not initialed by Joseph. In our opinion, there was no consideration furnished by the lessors for the modification and it was ineffective. William tried to get Joseph's consent to the modification but Joseph would not consent to it without first seeing his lawyer. Apparently he did not see his lawyer, for he did not agree to the modification. However, Mr. Trask assured William when the attempted modification was made that he could "fix it," i.e. get the insurance. It appears that he failed to do so after learning from O. F. Nelson & Co., Ltd. in Apia

that insurance could not be procured from the Liverpool & London & Globe Insurance Co., Ltd., Sydney, nor from its head office in Liverpool. However, the fact that insurance could not be procured from this one company does not prove at all that it could not have been procured from some other company engaged in marine insurance. There are many companies engaged in the marine insurance business. "Judicial notice will be taken of matters of common knowledge." 31 C.J.S. 510. Nevertheless, since there was no consideration furnished by the lessors for the modification and since Joseph did not assent to it, it follows that the failure of the defendants to procure insurance on the ship did not constitute a breach of contract, though no doubt William, under the circumstances, honestly believed that it did, particularly since Mr. Trask had assured him, when the legally ineffective modification was made, that insurance could be procured.

On February 16, 1961, after the ship had been refitted or almost completely refitted and was about ready to or already had made a trial run, William wrote a letter (actually drafted and typed by one Marcel but which William signed) to Herbert Scanlan in which he said "As per our agreement of past, there remains two important steps to be taken before I the owner of the 'M. V. SAMOA' will allow you to take my boat out for fishing. These two steps are: 1. Our contract must be finalized by having you and my mother sign it. 2. The boat must be insured by you for a value of $25,000." William sent copies of the letter to the Attorney General, the Director of Port Administration and the Manager of the Bank of American Samoa.

As a matter of fact, Herbert Scanlan, according to his own testimony, had signed the agreement. Even though William, as he testified, did not trust Mr. Trask, we do not believe from the evidence that Mr. Trask permitted the lessees to take possession of the ship without Herbert's

first having signed the lease, thereby obligating the lessees in writing for the rent.

On February 21, 1960 William, acting for himself, his mother and his brother Joseph, filed a petition in this Court praying (1) for "a preliminary injunction and restraining order prohibiting further use of the M. V. SAMOA by Samoan Fisheries pending hearing and adjudication of this petition by the Court" and (2) "To grant an indefinite injunction and restraining order prohibiting the further use of the M. V. SAMOA by Samoan Fisheries until such time as the agreement for the use of the vessel is settled by the parties." The petitioner also asked the Court to grant "possession of the said vessel to William Steffany until such time as the tentative agreement between the parties is finalized." The defendants were doing business under the name of the "Samoan Fisheries."

The Court did not issue a preliminary injunction or restraining order. When the petition came on for hearing, the defendants resisted it claiming that they had a valid lease agreement (the lease agreement of September 1959) although Alo Pepe had not signed and that they were entitled to possession of the vessel despite the fact that no insurance had been procured.

We think that the defendants, as they claimed when they resisted the petition, did have a valid lease agreement which was executed in September 1959, and that they were entitled to the possession of the vessel as they claimed, even though they had not procured the insurance and Alo Pepe had not signed. We have already set forth the reasons for this conclusion.

At the conclusion of the hearing on the petition and before the Court was ready to rule on whether or not an injunction should be granted, the petitioner withdrew his application for an injunction. In consideration of the withdrawal and of the petitioner's permitting the ship to go to

sea the defendants undertook "that if the said M. V. SA-MOA should be damaged or lost through the negligence of the lessees or their servants or from any other cause, except for damage sustained by Act of God or capture by pirates or alien enemies in time of hostilities" to indemnify the petitioner "to the extent of $10,000.00." The undertaking was limited to a period of 31 days from the date of the agreement which was March 4, 1960.

The defendants now claim that the letter of February 16, 1960 prepared by Marcel together with the petition for an injunction constitute a repudiation of the lease of September 1959 and put an end to it and that the indemnification agreement was the only existing agreement between the parties after the petition for the injunction was withdrawn on March 4, 1960.

[11] It is fundamental that a renunciation or repudiation in order to put an end to a contract by breach must be unequivocal and absolute.

"In order to justify the adverse party in treating the renunciation as a total breach, the refusal to perform must be of the whole contract or of a covenant going to the whole consideration, and it must be distinct, unequivocal, and absolute." 12 Am.Jur. 972.

This same doctrine was approved by the Supreme Court of the United States in the case of *Dingley v. Oler*, 117 U.S. 490, 29 L.Ed. 984, 6 Sup.Ct. 850, 854, in which the Court said:

"The most recent English case on this subject is that of *Johnstone v. Milling*, in the court of appeal, 16 Q.B. Div. 460, decided in January of the present year, which holds that the words or conduct relied on as a breach of contract by anticipation must amount to a total refusal to perform it, and that that does not, by itself, amount to a breach of the contract unless so acted upon and adopted by the other party."

We do not believe that the letter of February 16, 1960 or the petition for an injunction, either separately or taken

together, constituted an absolute and unequivocal renunciation of the September 1959 lease agreement. Taken together or taken separately they do not evince an intention that the defendants shall not have the ship but merely that they shall not go to sea with it until after Pepe and Herbert should sign and insurance on the ship be procured. In other words, William was asking delay in taking the ship to sea. His repudiation was at the most only partial, not unequivocal and absolute.

■ Assuming for the benefit of the defendants, but without agreeing, that there was such a repudiation as would have justified the defendants in treating the lease agreement as ended, the fact is that the defendants did not accept the repudiation. They resisted it when they resisted the petition on the hearing for an injunction. They claimed that the lease was valid and that they were entitled to possession of the vessel with the right to take it to sea; and we think that the defendants were correct in these claims. They rejected the so-called renunciation or repudiation. The editors of Corpus Juris Secundum say this:

"The renunciation of a contract by the promisor before the time stipulated for performance is not effective unless such repudiation is unequivocally accepted by the promisee. If the promisee declines to accept the renunciation and continues to insist on the performance of the promise, as he may do, the contract remains in existence for the benefit and at the risk of both the parties, and, if anything occurs to discharge it from other causes, the promisor may take advantage of such discharge." 17 C.J.S. 978.

■ In this case the defendants did not elect to accept the so-called repudiation. They rejected it by resisting the petition for an injunction and keeping possession of the ship. By their rejection they kept the lease agreement of September 1959 alive not only for their own benefit but also for the benefit of the plaintiffs as well.

471

When William withdrew the petition for an injunction he withdrew the so-called repudiation. Then it became the duty of the defendants to go ahead and perform their agreement.

"A withdrawal of a repudiation obligates the other party to perform." 12 Am.Jur. 976.

"In case the renunciation of the contract is not accepted by the adverse party, the renunciation may be withdrawn and the party renouncing after performance on his part may hold the adverse party to performance." 17 C.J.S. 979.

 As far as the indemnification agreement of March 4, 1961 is concerned, we are convinced from the evidence that it was intended by the parties only as a supplementary stop-gap agreement to give the defendants 31 days within which to get insurance which Mr. Trask had assured William, sometime before the injunction suit was instituted, could be procured. The indemnification agreement was obviously not a lease for 31 days. It included no provision for the payment of rent. It contained the provision with respect to what the ship was to be used for. It did not even provide that the defendants should have possession of the ship. True, it described the Samoan Fisheries as lessees but it contained no provision making the Samoan Fisheries (the defendants) the lessees of the ship. Looking only within the four corners of the indemnification agreement (as it was described by counsel for the defendants during the hearing and we think correctly so), the plaintiffs could have performed by permitting a third party to take the ship to sea on a pleasure cruise and if the ship had been lost within the 31 days due to a collision with a ship operated by a fourth party, the defendants would have been liable for not to exceed $10,000. Now, of course, no such ridiculous situation was ever intended by the parties. The indemnification agreement made sense only when read in connection with the September 1959 lease as a still continuing

agreement, and we are satisfied from the evidence that that is exactly what both the plaintiffs and the defendants intended when they entered into the indemnification agreement. Why were the defendants referred to in the indemnification agreement as "lessees" unless the parties considered that there was a pre-existing lease in effect? The indemnification agreement itself did not purport to be a lease.

And the circumstance that the lessees (the defendants), as will hereafter appear, asked William to take the ship back shortly after April 1, 1960 and again Joseph in August 1960, in order to get out of the payment of rent for the ship according to the lease, shows that the defendants themselves considered that the September 1959 lease was still in force after March 4, 1960 when the indemnification agreement was entered into. And Joseph and William likewise considered that it was still in force when they refused to accept surrender of the lease by taking the ship back. That was the practical construction put upon the lease agreement by both the lessors and the lessees in April and August 1960. Both parties regarded it as still binding. See 17 C.J.S. 755 quoted supra.

When partners Trask, Herbert, and Joe Langkilde went to Lotopa in Western Samoa in August 1960 and tried to surrender the M.V. SAMOA to Joseph their conduct could have had no relation to any other contract than the lease agreement of September 1959. The indemnification agreement by its own terms had come to an end 31 days after its execution on March 4, 1960.

The defendants took the ship to sea on four or five trial runs before March 13, 1960 at which time it was stipulated by the parties, as we have said, that the M. V. SAMOA was put into actual service as a fishing vessel. Sometime between March 13, 1960 and April 1, 1960, when Herbert Scanlan returned to American Samoa from New Zealand,

they took the ship to sea again for three days and caught some fish. However, they never caught enough fish on any of the runs to make a profit.

Shortly after Herbert came back from New Zealand, he and Joe Langkilde went across Pago Pago Bay to the Marine Railway to see William. They told William that they had no further use for the ship and that they couldn't run it. They wanted William to take the ship back but he told them that he'd have to see his lawyer and Joseph about it and that he wouldn't take the ship back. About August 1960 Trask, Joe Langkilde, and Herbert went to Lotopa in Western Samoa to see Joseph about taking the ship back, but when they proposed to him that the ship be taken back, he said that he would have to see his lawyer and that he would leave it up to his lawyer.

Apparently Joseph saw his lawyer because Attorney Metcalfe on August 11, 1960 wrote from Apia to William in Pago Pago as follows:

"Joe has informed me that two men, evidently Joe Langkilde and Herbert Scanlan, asked you to take back M. V. SAMOA and you advised them that you must consult your lawyer.

"I am glad you told them that because under the agreement which they signed the term of the lease is 12 months and there is no right to cancel it.

"They cannot compel you to take the ship back until the 12 months have expired unless it suits you to do so.

"I expect to be in Pago Pago on Monday the 15th and I shall try to telephone you or see you about what I think is the best thing to do."

 Counsel for the defendants claims, if the Court should find that the lease agreement of September 1959 was still in force, that the plaintiffs were obligated to minimize the damages by taking the ship back when Herbert and Joe Langkilde asked William to take it back at the Marine Railway shortly after April 1, 1960. This overlooks the fact that this lease agreement was not an ordinary contract but was a lease. There was no duty on the

474

part of the lessors to take the ship back. The editors of Corpus Juris Secundum say this:

"In order that the attempted surrender shall release the tenant from further payment of rent, it must be accepted by the landlord, unless it was made in compliance with a demand by the landlord." 52 C.J.S. 270. To the same effect, see 32 Am.Jur. 763.

When William told Herbert and Joe Langkilde that he would have to see his lawyer and Joseph and that he would not take the ship back, that was a rejection of the offer to surrender, not an acceptance. And when Joseph told Trask, Herbert and Joe Langkilde in Lotopa about August 1960 when asked by them to take the ship back that he, too, would have to see his lawyer, that was likewise a rejection of the offer to surrender.

The defendants retained possession of the ship for 12 months after March 13, 1960 when, as was stipulated, it was put into service as a fishing vessel. At the expiration of the 12 months the lessors resumed possession. About the time of the conversation at the Marine Railway, the defendants tied the ship up to a buoy in Pago Pago Bay where it still is. While it was tied up and still in their possession, the defendants had it inspected two or three times a week to see that it remained in good condition. The lease required the defendants to "always maintain the M. V. SAMOA in a seaworthy condition" and upon its termination to return it "to the lessors in a seaworthy condition together with all permanent improvements made thereon."

Our conclusion is that the defendants are liable in this action for 10 installments of rent which began to accrue on March 13, 1960 when the M. V. SAMOA was put into service as a fishing vessel. The petition in this case was filed on January 31, 1961. The plaintiffs were entitled to recover rent as it fell due. See 32 Am.Jur. 433. But they are not entitled in this action to recover more rent than was due at the time the petition was filed. The plaintiffs have

sued for 11 months' rent but rent for only 10 months was due on January 31, 1961 when the action was instituted. The plaintiffs are entitled to recover rent for 10 months.

### JUDGMENT

Accordingly, it is ORDERED and ADJUDGED that the defendants Herbert J. Scanlan, Joe Langkilde and intervener-defendant Bernard K. Trask shall pay to the plaintiffs, William Steffany, Joe Steffany, and Alo Pepe Steffany, the sum of $10,000.

It is FURTHER ADJUDGED by the Court that the above-named defendants and the intervener-defendant were partners with respect to the transactions resulting in this judgment for $10,000.00 to be paid by them to the plaintiffs.

And it is FURTHER ORDERED and ADJUDGED that the defendants Herbert J. Scanlan, Joe Langkilde, and intervener-defendant Bernard K. Trask shall pay as costs to the Clerk of the High Court the sum of $58.33.